```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA

                      Alexandria Division


BUFFALO WINGS FACTORY, INC.,  )
                              )
     Plaintiff,               )
                              )
          v.                  )    1:07cv612 (JCC)
                              )
MOHD, et al.,                 )
                              )
     Defendants.              )
```

### **M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Plaintiff's Emergency Motion for a Temporary Restraining Order to Freeze the Stock and Assets of the Defendants and Rule 65(d) Respondents ("Pl.'s TRO Mot."). For the reasons stated below, the Court will **grant** the Motion in part and **deny** it in part.

### I. Background

The facts as stated in the First Amended Complaint are as follows. Since 1990, Buffalo Wings Factory, Inc. ("Plaintiff"), a Virginia corporation, has operated four restaurants in Sterling, Ashburn, Chantilly, and Reston, Virginia that specialize in the sale and marketing of "buffalo wings." Plaintiff has a valid and existing trademark registration for the mark "Buffalo Wings Factory" (the "Factory Mark") and has spent approximately $80,000 per year since 2000 advertising its restaurants and the Factory Mark in local newspapers and print

1

advertising, and on local radio stations.  Plaintiff's restaurants and the Factory Mark have achieved critical acclaim and popularity, helping Plaintiff generate a customer base that extends into West Virginia and Maryland and sales revenues equaling $5-6 million per year.

Defendants Saleem Mohd ("Saleem") and Naeem Mohd ("Naeem") worked for Plaintiff between 1996 and 2004.  On or about September 1, 2005, Saleem and Naeem opened a restaurant in Herndon, Virginia doing business under the name "Buffalo Wing House."  The Complaint alleged that Saleem and Naeem acted as employees, owners, and operators of this restaurant.  Defendant Charbroil Grill of Worldgate, Inc. ("Charbroil Grill") allegedly co-owns the restaurant, with Sudha Chopra ("Chopra") serving as its president and Saleem as its secretary.

According to Plaintiff, Saleem, Naeem, and Charbroil Grill (collectively, "Defendants") selected "Buffalo Wing House" as the name for their restaurant because it was substantially similar to the name of Plaintiff's restaurants and would cause customer confusion.  Plaintiff further alleges that Defendants have used similar slogans and advertising channels as Plaintiff for the same purpose.  For example, Plaintiff has used the slogan "Buffalo Wing Factory - Home of the Flatliner" in its newspaper and print advertising and on its menus, while Defendants have used "Buffalo Wings House – House of the Inferno" in the same

types of newspaper and print advertising and on their menus.

   The alleged similarities and deliberate attempts to cause customer confusion do not end there.  Defendants' first menu was substantially similar to Plaintiff's with respect to layout, daily specials, and sauces.  In addition, Plaintiff's and Defendants' facilities have several features in common: they are all located in strip malls in the Dulles Corridor, they are all casual dining restaurants with sports themes, large televisions, bars, and sit-down dining areas, and they all have similar furniture, color-schemes, and neon signs.

   Plaintiff contends that these numerous similarities – adopted willfully and intentionally by Defendants – have caused substantial and continuous customer confusion.  Plaintiff cites several examples of this confusion, including: (1) customer statements to Plaintiff's employees regarding Plaintiff's Herndon restaurant – even though it is Defendants, not Plaintiff, who have a restaurant in Herndon; (2) questions from customers to Plaintiff's restaurants regarding promotions being run by Defendants' restaurant; (3) attempts by customers to use Defendants' coupons at Plaintiff's restaurants; and (4) confusion between Defendants' restaurant and Plaintiff's restaurants on the part of Defendants' vendors and the Miller beer distributor for Fairfax County.  Plaintiff also argues that Defendants themselves have intentionally furthered this confusion by telling

Plaintiff's customers, employees, and third party vendors that Defendants' restaurant is the same as Plaintiff's.

Finally, Plaintiff asserts that Defendants have stolen Plaintiff's confidential information and misappropriated it as their own.  Defendants hired several of Plaintiff's former employees, including the former general manager of one of Plaintiff's restaurants, in the hope of acquiring the confidential information those employees possess and to confuse customers.  In addition, the creation and ingredients of twenty of Defendants' thirty sauces are Plaintiff's trade secrets that were copied by Saleem and Naeem for use in Defendants' restaurant.

In response to these alleged acts, Plaintiff filed a Complaint against Defendants on June 22, 2007, claiming: (1) false advertising and false designation of origin in violation of the Lanham Act; (2) trademark infringement under Va. Code § 59.1-92.1; (3) misappropriation of trade secrets; (4) tortious breach of fiduciary duty; (5) unfair competition; (6) violation of the Business Conspiracy Act under Va. Code §§ 18.2-500 *et seq.*; and (7) tortious interference with actual and prospective contracts and business relationships.  Defendants moved to dismiss the Complaint on July 20, 2007.  On October 1, 2007, Judge Gerald Bruce Lee of this Court granted Defendants' Motion to Dismiss as to Count I on the ground that Plaintiff did not plead a set of

facts supporting its allegation that Defendants' use of the "Buffalo Wing House" mark was likely to confuse consumers. Judge Lee then granted Plaintiff leave to amend its Complaint.

On October 15, 2007, Plaintiff filed its First Amended Complaint, bringing the same claims as the original Complaint but adding more factual allegations. Defendants moved to dismiss the First Amended Complaint on October 25, 2007. In an Opinion dated December 12, 2007, this Court denied Defendants' Motion to Dismiss. The Court later set a trial date of March 3, 2008. Instead of proceeding to trial, the parties resolved the case by mutual agreement to the terms of a settlement agreement. On March 3, pursuant to the parties' wishes, the Court entered a Consent Order ("CO") that included both monetary terms and injunctive provisions requiring Defendants to change their trademarks, tag lines, signs, menu and product offerings, and to drop several of their copycat sauces. The CO required Defendants to complete those changes by June 1, 2008 (the "Conversion Date"), which was also the date on which Defendants' first installment payment, in the amount of $30,000, was due. On April 29, 2008, Defendants filed a Motion for Relief from Judgment under Fed. R. Civ. P. 60, seeking to have the CO set aside. After taking evidence on the matter, the Court denied this Motion and confirmed the CO in an Opinion and Order dated June 23, 2008.

On June 13, 2008 – prior to the Court's decision

confirming the CO but after the Conversion Date – Plaintiff's counsel sent a letter to Defendants' counsel accusing Defendants of continuing to violate the CO and demanding both compliance and payment of $150,000.  A second letter was sent to defense counsel on June 25, 2008, stating that Plaintiff would file a motion for contempt sanctions and to enforce the CO unless Defendants met their obligations by July 2, 2008.  On July 3, 2008, Plaintiff filed a Motion to Enforce the Consent Order and for Contempt Sanctions, accusing Defendants of failing to comply with their obligations under the CO.  Defendants then filed a Motion to Dismiss Plaintiff's Motion on July 17, 2008.  Plaintiff responded on July 25, 2008 with a Motion to Strike Defendants' Motion.  In an Order dated August 4, 2008, this Court granted Plaintiff's Motion to Enforce and Motion for Contempt Sanctions, denied Defendants' Motion, and denied Plaintiff's Motion to Strike.

       Since that time, Plaintiff claims that Defendants still have made no significant effort to comply with their obligations under the Consent Order.  After a second contempt hearing on additional sanctions, the Court reiterated its earlier Contempt Order and the CO, held three Rule 65(d) Respondents – Jaji Shah, Seema Saleem, and SS Herndon, Inc. ("SS Herndon," collectively, the "Respondents") in contempt, and enjoined the Mohds from working at or receiving money from the infringing restaurant.  (SS Herndon appears to have been, at least until recently, the

record owner of the infringing restaurant.)  As a result of their inaction on the CO and on two Contempt Orders from this Court, Defendants and Respondents owe a significant amount of sanctions and attorneys' fees to Plaintiff.  They have, as yet, made no effort to pay those amounts.

Plaintiff now claims to have learned that Respondents have sought permission to transfer the lease on the infringing restaurant to one Vinod Chopra, the brother of Respondent Seema Saleem and uncle and brother-in-law of Defendants Naeem Mohd and Saleem Mohd, respectively.  Plaintiff also claims that the owners of Respondent SS Herndon have made preliminary inquiries into selling the restaurant.  Defendants and Respondents did not agree to Plaintiff's request for a voluntary Consent Order requiring Court approval of a transfer or sale of SS Herndon stock or assets.  As a result, Plaintiff filed its emergency TRO motion.

At the motion hearing, it became apparent that SS Herndon, Inc. has already begun the process of transferring the lease of the restaurant.  SS Herndon, Inc. also acknowledged that it has sold all of its assets to Vinod Chopra for $110,000, $20,000 of which remains to be paid.

This motion is before the Court.

## II. Standard of Review

The issuance or denial of a preliminary injunction or temporary restraining order "is committed to the sound discretion

of the trial court." *Quince Orchard Valley Citizens Ass'n, Inc v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989).  In determining whether an injunction is appropriate, a district court first determines whether the plaintiff has made a strong showing that irreparable harm will occur if the injunction is denied.  *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir. 2002) (citing *Safety-Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846, 859 (4th Cir. 2001)).  The court then applies the "balance-of-hardship" test.  *See Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 194 (4th Cir. 1977); *Railway Labor Execs.' Ass'n v. Wheeling Acquisition Corp.*, 736 F. Supp. 1397, 1401-02 (E.D. Va. 1990) (Ellis, J.) (applying *Blackwelder* test to determine issuance of temporary restraining order).

      Under the test, a court should examine the following four factors: (1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest.  *See Hughes Network Systems, Inc. v. InterDigital Comm'n Corp.*, 17 F.3d 691, 693 (4th Cir. 1994); *Blackwelder*, 550 F.2d at 193-96; *see also Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).  No single factor can defeat a motion for a preliminary injunction or TRO.  Rather, "[t]he decision to grant or deny a preliminary injunction depends upon a 'flexible

interplay' among all the factors considered." *Blackwelder*, 550 F.2d at 196.

### III. Analysis

Plaintiff requests that the Court order the following provisions: (1) freeze the stock and assets of the corporate defendant and corporate respondent, such that stock and assets cannot be sold, assigned, transferred or dissipated without court approval and new shares cannot be issued without court approval; (2) freeze the proceeds from any sale, transfer or assignment – past, present or future – and direct any such proceeds to be paid into Court; and (3) freeze all assets of Defendants and Respondents, with the exception of money used to pay bills of less than $1,000 for pre-existing debts in the ordinary course of business.  Pl.'s TRO Mot. at 4-5.  In carefully balancing the factors of the *Blackwelder* test, for the reasons stated below, the Court will order the remaining $20,000 payment to be paid into the Court.  The Court finds that the other requested injunctions are inappropriate at this point, given that SS Herndon has completed the sale of its assets to Vinod Chopra.  The Court also notes that at this time it does not have sufficient evidence to find a fraudulent conveyance between Respondents and Mr. Chopra.  Plaintiff may be able to pursue other remedies, such as garnishment, attachment, or forced bankruptcy as to the already-transferred money.

A. <u>Likelihood of Irreparable Harm to the Plaintiff Without the TRO</u>

Plaintiff has shown that it is highly likely to suffer irreparable harm in the absence of a TRO requiring future payments to SS Herndon as part of the asset sale to be paid into the Court.  Normally, monetary harms that can be satisfied by damages are not considered irreparable. *See Hughes Network Systems, Inc. v. InterDigital Comm. Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).  The harm caused by a defendant's inability to pay damages, however, can be considered irreparable. *See id.* (citing *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 206 (3d Cir. 1990)).  In *Hoxworth*, the court decided that a district court could issue an injunction to protect future damages so long as the court attempted to relate the value of the assets encumbered to the value of the expected judgment.  903 F.2d at 198.

Courts have approved the use of injunctions to prevent the dissipation of assets and preserve the status quo in order to protect assets that may be subject to collection pending the outcome of a case. *See Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940).  Here, as in *Deckert*, the affected assets are related to proceedings based in equity – that is, enforcing the injunctions contained in the CO.  Moreover, in this case Respondents and Defendants already owe the Plaintiff contempt

10

sanctions for their failure to comply with injunctions entered against the infringing restaurant.

Without a TRO ordering the payment of the remaining $20,000 into Court, Plaintiff will have little to no opportunity to collect the money it is owed.  The Mohds have sparse personal assets, and Charbroil Grill of Worldgate, Inc. is an empty shell corporation.  *See* Pl.'s TRO Mot., Exs. I1-3, J1-3, K.  It is unclear what Respondent Jaji Shah owns or controls outside of his interest in SS Herndon.  After the asset sale, SS Herndon is also likely to become a shell corporation and may declare bankruptcy.  Directing payment of the last installment owed to SS Herndon under the asset sale agreement would not shield assets substantially more valuable than what Respondents already owe Plaintiff.  The Court will thus find that this factor of the *Blackwelder* test weighs heavily in favor of Plaintiffs.

    B. <u>Likelihood of Harm to the Defendants and Respodnents with a TRO</u>

The Court does not perceive any serious likelihood of harm to the Defendants or Respondents.  The TRO entered would affect less than one fifth of the total amount in the asset sale, a much smaller sum than Defendants and Respondents owe to Plaintiff.  Ordering that the remaining sum be paid into the Court will restrict Respondents' freedom to the extent that it limits their ability to use a payment due to them.  However,

11

given the Defendants' and Respondents' continued attempts to evade the numerous Orders entered by this Court – which now include an asset sale to transfer the ability to run the restaurant to a third (but related) party – Respondents are solely responsible for the TRO.  Any harm associated with a TRO was self-inflicted.

### C. Plaintiff's Likelihood of Success on the Merits

The "plaintiff's likelihood of success" inquiry does not apply directly to this case, because Plaintiff and Defendants have already entered the CO, which contains injunctions aimed at Defendants and, now, Respondents as well.  Moreover, Plaintiff has successfully brought two contempt proceedings, first against Defendants and then against Defendants and Respondents.  There is no doubt that Plaintiff is entitled to the benefit of the injunctions entered by the Court and to the contempt payments due to it.  If the "likelihood of success" prong points in any direction, then, it heavily favors Plaintiff, which has already succeeded in its *legal* effort to stop the infringement of its trademark and other rights, and is now attempting to enforce judgments rendered in its favor.

### D. The Public Interest

In this case, the public interest is not be harmed by a temporary restraining order.  The public has a strong interest in the enforcement of trademark law and in discouraging parties from

ignoring court orders.  The TRO will serve the public interest rather than frustrate it.

### IV. Conclusion

For the reasons stated above, the Court will **grant in part and deny in part** Plaintiffs' Emergency Motion for a Temporary Restraining Order.

An appropriate Order will issue.


October 23, 2008                              /s/
Alexandria, Virginia                   James C. Cacheris
                              UNITED STATES DISTRICT COURT JUDGE